# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANET MCCORMICK, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 12-227 |
| | ) |
| v. | ) Judge Cathy Bissoon/ |
| | ) Magistrate Judge Maureen P. Kelly |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) Re: ECF Nos. 7, 11 |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II. REPORT

**A. BACKGROUND**

**1. Procedural History**

Janet McCormick ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f (the "Act"). Plaintiff filed for benefits claiming an inability to work due to disability beginning December 24, 2007. (R. at 32, 116 – 29).[1] Plaintiff's alleged

---

[1] Citations to ECF Nos. 3 – 3-10, the Record, *hereinafter*, "R. at __."

disabling impairments initially included depression and anxiety. (R. at 144). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 7, 11).

**2. Personal Background**

Plaintiff was born on April 4, 1967, and was forty three years of age at the time of her administrative hearing. (R. at 34). Plaintiff lived alone in her own apartment. (R. at 33, 49, 51 – 52). Plaintiff had adult children and a young grandson. (R. at 46). She was separated from her husband of twenty-five years. (R. at 45). She indicated that she had not yet sought a divorce because she lacked adequate funds. (R. at 35).

Plaintiff dropped out of school at the age of fourteen due to pregnancy, having only completed the sixth grade. (R. at 36 – 37). Plaintiff did not return to school, nor did she attempt to obtain a graduate equivalent diploma ("GED") or vocational training. (R. at 37). She was a stay-at-home mother until 1999, when she entered the workforce. (R. at 40 – 41). Her employment included initially working for an in-home care service for the elderly, and beginning in 2002, working at a nursing home as a housekeeper. (R. at 38 – 40). Plaintiff was last employed briefly by K-mart as a cashier, which employment ended in December 2007. (R. at 38). Plaintiff quit her job at K-mart because she could not deal with other people. (R. at 283). Thereafter, Plaintiff subsisted on cash assistance and food stamps, and some aid from family members. (R. at 49). She also received healthcare coverage through the Commonwealth of Pennsylvania. (R. at 49).

**3. Treatment History**

Plaintiff underwent a psychiatric evaluation with Lenora Borucki, C.R.N.P. of Chestnut Ridge Counseling Services ("Chestnut Ridge") on September 30, 2008. (R. at 259 – 60). It was

noted in the evaluation that Plaintiff had begun treatment for depressed mood in 2007 at Chestnut Ridge, but that she failed to take prescribed medications as advised, and failed to continue with recommended treatment between December 2007 and September 2008. (R. at 259 – 60, 268). Plaintiff complained of significant depression, anxiety, and worried thinking. (R. at 259 – 60). She claimed to have occasional panic attacks, increased irritability, and angry outbursts. (R. at 259 – 60). Plaintiff experienced difficulty with sleeplessness, fatigue, and concentration. (R. at 259 – 60). She had a passive death wish, and was easily tearful. (R. at 259 – 60). Plaintiff had once attempted self-harm by overdosing on Lexapro. (R. at 259 – 60). She denied past hospitalization for psychiatric reasons, and stated that she had not tried to harm herself since the overdose. (R. at 259 – 60).

Nurse practitioner Borucki noted that Plaintiff had first come to Chestnut Ridge following separation from her husband. (R. at 259 – 60). The refusal of her husband to reconcile triggered her depressed state. (R. at 259 – 60). It was also noted that Plaintiff had little education, and had become pregnant at fourteen years of age. (R. at 259 – 60). Her children were adults, and while she maintained a relationship with her daughter, she was estranged from her son. (R. at 259 – 60). Borucki observed Plaintiff to be depressed, anxious, slow, and tearful, but nonetheless exhibiting alertness, orientation, connection to reality, and logical, goal-oriented thought. (R. at 259 – 60). She diagnosed Plaintiff with major depression, and passive dependent personality disorder, and recorded a global assessment of functioning[2] ("GAF") score of 48. (R. at 259 – 60). Plaintiff was prescribed Prozac and individual therapy. (R. at 259 – 60).

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and

A clinical progress note dated October 17, 2008, showed that Plaintiff was adhering to her Prozac regimen, but still reported some depression and anxiety. (R. at 267). Plaintiff was informed that it was still too early to discern if the Prozac was working. (R. at 267). Plaintiff denied experiencing racing thoughts, visual or audible disturbances, hallucinations, delusions, and suicidal ideation. (R. at 267). Her attention span and concentration was relevant to topic, and Plaintiff's mood was fair. (R. at 267).

Plaintiff continued with treatment at Chestnut Ridge for twelve months through October 2009. (R. at 347 – 64). Plaintiff was provided with prescription medication management for her mental condition. (R. at 347 – 64). Despite trying several prescription medications, Plaintiff still had difficulty falling asleep, and experienced daytime fatigue. (R. at 347 – 64). Plaintiff complained of ongoing depression that centered upon her separation from her husband, as well as anxiety and panic attacks. (R. at 347 – 64). She was otherwise generally noted to be alert and oriented, groomed, and without suicidal ideation – although occasional passive death wishes were noted. (R. at 347 – 64). Plaintiff's medications were regularly adjusted to treat her symptoms. (R. at 347 – 64). She did begin to see improvement in her mood in April, May, and August 2009, and was able to regularly go out for tanning treatments. (R. at 347 – 64). She also began to enjoy time with her grandchildren more. (R. at 347 – 64). By October 2009, it was

---

experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

noted that Plaintiff was taking her medications consistently and that she denied suicidal ideation, depression, anxiety, and racing thoughts. At that time, Plaintiff denied hallucinations and delusions, her conversation/ attention/ concentration were relevant to topic, her moods were fair, and her sleep and appetite were good/ fair. (R. at 347 – 64).

In December 2008, at the request of the Bureau of Disability Determination, Thomas E. Andrews, Ph.D. conducted a clinical psychological evaluation of Plaintiff. (R. at 281 – 87). Plaintiff recalled her personal history well. (R. at 281 – 87). She claimed that she could not deal well with other people, and had few friends. (R. at 281 – 87). Yet, she saw her daughter frequently and maintained a good relationship. (R. at 281 – 87). She informed Dr. Andrews that she could not work because of insomnia. (R. at 281 – 87). Despite going to bed between 9 p.m. and 10 p.m., and the use of sleep aids, Plaintiff could not keep a good sleep schedule. (R. at 281 – 87). As a result of her separation from her husband, Plaintiff reported feelings of anxiety and depression. (R. at 281 – 87). She was often tired, irritable, and tearful. (R. at 281 – 87). She alluded to experiencing panic attacks. (R. at 281 – 87). Plaintiff reported to Dr. Andrews that she had started treatment at Chestnut Ridge to deal with these feelings, but discontinued treatment for several months. (R. at 281 – 87). She stated that as of the date of the evaluation on December 19, 2008, she attended treatment regularly. (R. at 281 – 87). Plaintiff explained to Dr. Andrews that she still did not follow all of her therapist's treatment recommendations. (R. at 281 – 87).

When asked by Dr. Andrews about daily activities, Plaintiff was reluctant to answer his questions. (R. at 281 – 87). She claimed to do nothing but watch television. (R. at 281 – 87). Her girlfriend would help her clean and shop for groceries. (R. at 281 – 87). Plaintiff stated that she did not drive because she did not have a car. However, she drove herself to the examination.

(R. at 281 – 87).  She claimed that she no longer played computer games because she did not have a computer.  (R. at 281 – 87).

Dr. Andrews observed that Plaintiff had a clean and neat appearance, and that she maintained grooming and hygiene independently, effectively, and appropriately.  (R. at 281 – 87).  She had a sad demeanor and was mildly tearful, although she also managed to smile at times.  (R. at 281 – 87).  Plaintiff had a mildly constricted general fund of knowledge: she had difficulty with serial 7's, but not serial 3's, she could perform simple similarities testing easily, but not complex similarities, she had difficulty with metaphors, and her overall response rates were somewhat slow.  (R. at 281 – 87).  Dr. Andrews estimated that Plaintiff's intellect was likely in the low-average to borderline range.  (R. at 281 – 87).

During the evaluation by Dr. Andrews, Plaintiff was fully oriented, was able to think, reason, and respond adequately, had grossly intact memory, and had goal-oriented, relevant, and logical thought processes.  (R. at 281 – 87).  However, she exhibited difficulty with expressive language.  (R. at 281 – 87).  Plaintiff performed all tasks and responded to all questions without any confusion, loss of concentration, or difficulty with attention span.  (R. at 281 – 87).  Her pace was at times slow, but she persisted well with encouragement.  (R. at 281 – 87).  Her mental content was free of impairment or distortions of reality, although she did ruminate over minor issues.  (R. at 281 – 87).  There were no signs of psychomotor dysfunction.  (R. at 281 – 87).  Plaintiff provided adequate responses to judgment questions.  (R. at 281 – 87).  She was cooperative throughout her evaluation by Dr. Andrews.  (R. at 281 – 87).

Dr. Andrews diagnosed Plaintiff with chronic adjustment disorder, and mixed mood of anxiety and depression.  (R. at 281 – 87).  He also noted a provisional diagnosis of borderline intellectual functioning.  (R. at 281 – 87).  His specific findings indicated that Plaintiff would

experience marked limitation interacting with the public and supervisors, and marked limitation responding appropriately to pressures in a usual work setting and to changes in a routine work setting. (R. at 281 – 87). Dr. Andrew's remaining findings evidenced only slight to moderate limitations in functioning in all other respects. (R. at 281 – 87). Plaintiff would not have difficulty managing her benefits. (R. at 281 – 87).

A Mental Residual Functional Capacity Assessment ("RFC") was completed by state agency evaluator Douglas Schiller, Ph.D., on December 29, 2008. (R. at 288 – 90). Following a review of the medical record up until that date, Dr. Schiller concluded that Plaintiff would experience only insignificant to moderate limitations in all areas of functioning as a result of diagnosed affective disorders and personality disorders. (R. at 288 – 90). He felt that Plaintiff was capable of engaging in substantial gainful activity because, in spite of her limitations, she could carry out very short, simple instructions, and had no deficits in understanding and memory. (R. at 288 – 90). As support, Dr. Schiller cited to the examination conducted by Dr. Andrews. (R. at 288 – 90). However, Dr. Schiller opined that the marked findings made by Dr. Andrews were an overestimation of Plaintiff's degree of limitation, because it was inconsistent with the medical record as a whole. (R. at 288 – 90).

Approximately ten months later, on November 3, 2009, Plaintiff completed the intake process for treatment at Axiom Family Counseling Services ("Axiom"). (R. at 331 – 341). She also underwent an initial mental status examination with a therapist. (R. at 342 – 44). Plaintiff complained of depression and anxiety. (R. at 342 – 44). She was observed to be oriented and properly groomed. (R. at 342 – 44). Her judgment and insight were determined to be fair, her memory and attention were good, and her impulse control was fair/ good. (R. at 342 – 44). Her motor behavior during her interview was normal, she had depressed mood, exhibited blunt affect,

and had normal thought and speech. (R. at 342 – 44). She was noted to be cooperative throughout the process. (R. at 342 – 44). She indicated that her relationship difficulties with her husband and another person had been responsible for her depression. (R. at 342 – 44). Plaintiff was diagnosed with adjustment disorder and depression. (R. at 342 – 44). She was assessed a GAF score of 46. (R. at 342 – 44). Plaintiff's prognosis was positive, with therapy. (R. at 342 – 44). Plaintiff self-discharged from the Axiom program prior to engaging in treatment on November 11, 2009. (R. at 327 – 28).

Plaintiff was voluntarily admitted to Southwest Regional Medical Center of Waynesburg, Pennsylvania, on November 5, 2009, because she thought about hurting herself. (R. at 367). She was observed to be in no acute distress, but had a flat affect. (R. at 367 – 68). She was diagnosed with major depression and referred to psychiatric services. (R. at 368). She complained of increases in depression, anxiety, tearfulness, mood swings, and irritability. (R. at 372). She admitted to stopping all prescribed medications one week prior. (R. at 372). She cited relationship stressors as the trigger for the uptick in her symptoms. (R. at 372). Plaintiff was discharged from the hospital on November 9, 2009.

On December 3, 2009, Plaintiff began treatment with psychiatrist R.K. Mehta, M.D., and psychotherapist Marianne M. Uffelman, L.C.S.W. (R. at 318 – 19). In an initial session with Dr. Mehta, Plaintiff's chief complaint was depression. (R. at 318 – 19). Plaintiff was observed to be alert and oriented, cooperative, and groomed. (R. at 318 – 19). Her affect was constricted and her mood was anxious. (R. at 318 – 19). Plaintiff's thought processes vacillated between organized and disorganized, and her thought content vacillated between logical and illogical. (R. at 318 – 19). She denied suicidal ideation. (R. at 318 – 19). Her concentration was poor, but her memory, judgment, and insight were intact. (R. at 318 – 19). She did admit experiencing

delusions. (R. at 318 – 19). She was noted to be on Depakote and Seroquel, and experienced no side effects. (R. at 318 – 19). Her Depakote dosage was increased. (R. at 318 – 19). She was diagnosed with bipolar disorder, depressive phase. (R. at 318 – 19).

A psychiatric treatment history completed by Dr. Mehta and Ms. Uffelman on December 18, 2009 indicated that Plaintiff had recurrent major depressive disorder and some evidence of paranoia. (R. at 320 – 26). Plaintiff acknowledged an overdose in 2007. (R. at 320 – 26). She stated that she needed to be cared for by others, and did not make her own decisions. (R. at 320 – 26). She claimed that she never formed her own identity. (R. at 320 – 26). She also stated that she was overly sensitive to criticism. (R. at 320 – 26). She was often tearful, sad, and lonely. (R. at 320 – 26). Ms. Uffelman noted Plaintiff's affect to be flat, her mood to be very depressed, her speech was poor, her thoughts were slow, her concentration was impaired, her memory was impaired, her judgment was impaired, and her insight was limited. (R. at 320 – 26). Hallucinations and delusions were denied. (R. at 320 – 26). Plaintiff was diagnosed with major depressive disorder and dependent personality disorder. (R. at 320 – 26). She was assigned a GAF score of 37. (R. at 320 – 26).

Plaintiff continued psychotherapy with Ms. Uffelman, ending on March 16, 2010 after five sessions. (R. at 306, 308, 310, 315 – 17). During her therapy, Plaintiff expressed difficulty moving on from her past relationships. (R. at 315 – 16). Plaintiff was advised to be more independent. (R. at 315). Ms. Uffelman also attempted to advise Plaintiff about how to re-establish a normal sleep schedule. (R. at 310, 316). Plaintiff did believe her medications were helping her symptoms, but consistently complained of feeling depressed and fatigued. (R. at 308, 310). Ms. Uffelman felt that if Plaintiff could develop coping strategies, she could better handle the responsibilities of daily life and reduce her anxiety. (R. at 310). Plaintiff stopped

having outbursts of anger. (R. at 306). Plaintiff's sister was noted to be supportive. (R. at 306). At Plaintiff's last session, she was noted to be unable to focus, had no energy, lacked interest, was unhappy, and had poor sleep patterns. (R. at 306).

Plaintiff had medication management consultations with Dr. Mehta four times ending on March 11, 2010. (R. at 307, 309, 311 – 14, 318 – 19). Dr. Mehta generally documented overall improvement in Plaintiff's symptoms. While Plaintiff's mood was often sad and depressed, her concentration fair or poor, and her affect constricted or flat, she was well-groomed, spoke appropriately, had logical and organized thought, had intact judgment and insight, and had intact memory. (R. at 311, 313). Plaintiff did not have hallucinations or delusions, and did not experience suicidal ideation. (R. at 313). She also did not complain of medication side-effects. (R. at 307, 311, 313). Plaintiff's mood was also noted to stabilize. (R. at 314). Dr. Mehta added Cymbalta to Plaintiff's medication regimen to determine whether there was any benefit. (R. at 309).

On March 16, 2010, Ms. Uffelman completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on Plaintiff's behalf. (R. at 376 – 77). In the assessment, Ms. Uffelman indicated that Plaintiff had poor to no ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain attention/ concentration, understand, remember, and carry out job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (R. at 376 – 77). The cited reasons for such severe functional deficits were Plaintiff's depression and inability to maintain concentration. (R. at 376 – 77). Ms. Uffelman relied upon Plaintiff's own statement to the effect that she could not handle her own money. (R. at (R. at 376 – 77). Plaintiff's diagnoses were

10

listed as major depressive disorder with paranoia, and dependent personality disorder. (R. at 376 – 77). Her highest GAF score over the past year was 37, and her GAF at the time of the assessment was 42. (R. at 376 – 77).

**B.    ANALYSIS**

**1. Standard of Review**

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[3]  Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]  Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

**2. Discussion**

Based upon the medical record in this case, the ALJ determined that Plaintiff suffered severe impairments of major depressive disorder and passive dependent personality disorder versus low average to borderline intellectual function and chronic adjustment disorder with anxiety and depression. (R. at 11). In spite of these impairments, Plaintiff was considered able to engage in work at all exertional levels, except that such work could only involve one or two-step work activity, only occasional interaction with supervisors and co-workers, no interaction with the public, and no requirement for rapid production pace. (R. at 16). Based upon the testimony of the vocational expert, even with such limitations, Plaintiff was capable of engaging in work existing in significant numbers in the national economy. (R. at 20 – 21). As a result, the ALJ ruled that Plaintiff was not entitled to DIB or SSI.

Plaintiff objects to these determinations by the ALJ, arguing that he erred in failing to give full credit to Plaintiff's treating/ examining sources, and in improperly weighing the medical evidence on record. (ECF No. 8 at 4 – 13). Specifically, Plaintiff argues that had the report of Ms. Uffelman and/ or the report of Dr. Andrews been accepted in its entirety, Plaintiff would be

disabled according to the Act, and that the evidence used to discredit these reports – Dr. Schiller's RFC and select excerpts from the medical record – were weak evidence, at best. (ECF No. 8 at 4 – 9). Plaintiff goes on to state that the longitudinal record, as a whole, demonstrates limitations far more extensive than those provided for in the ALJ's RFC and hypothetical. (ECF No. 8 at 10 – 13). Defendant counters by arguing that the assessments are both internally inconsistent and inconsistent with the longitudinal record, that Dr. Schiller's opinion is entitled to significant weight, and that the record – as a whole – does not demonstrate consistently significant limitations of the severity claimed by Plaintiff. (ECF No. 12 at 13 – 19). The Court agrees with Defendant.

With respect to the ALJ's treatment of the record, as a whole, "[t]his court has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). While it is understood that the ALJ is required to analyze and choose between conflicting medical accounts – and that the ALJ's findings are not expected to be as rigorous as the analyses of a medical professional or scientist – if the ALJ has not adequately explained his or her treatment of obviously probative evidence, the Court cannot say whether substantial evidence supports an ALJ's conclusion. *Id.* at 705 (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) ("the special nature of proceedings for disability benefits dictates extra care on the part of the agency in . . . explicitly weighing all evidence.")). The ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). A decision should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F.3d 34, 42

(3d Cir. 2001). "Courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Cotter*, 642 F.2d at 705 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). In this case, the Court has no difficulty following the ALJ's logic.

The medical record does not present a consistent record of inability to function. As noted by the ALJ, despite her typical complaints of depression and anxiety in 2007, Plaintiff failed to attend therapy at Chestnut Ridge for the better part of a year. (R. at 12 – 15, 17 – 19). When she returned to Chestnut Ridge, she made slow – but steady – progress that culminated in an October 2009 report which stated that Plaintiff no longer experienced any depression or anxiety. (R. at 12 – 15, 17 – 19). While Plaintiff voluntarily admitted herself to the hospital approximately one month thereafter, it was after she admittedly stopped taking all of her prescribed medications. (R. at 12 – 15, 17 – 19). This was not the only treatment compliance issue that appeared in the record. (R. at 12 – 15, 17 – 19). Further, Plaintiff's bouts of depression and anxiety were admittedly rooted in her difficulties with two particular personal relationships. (R. at 12 – 15, 17 – 19). Nonetheless, Plaintiff was capable of maintaining a relationship with her daughter, sister, and one of her friends. (R. at 12 – 15, 17 – 19). While Plaintiff did not appear to make significant progress – or progress similar to that seen at Chestnut Ridge – while under Dr. Mehta and Ms. Uffelman's care, as noted by the ALJ, four and five sessions, respectively, over a four month period is hardly an extensive longitudinal record of treatment. (R. at 12 – 15, 17 – 19).

Additionally, Plaintiff's arguments are weakened, as are the conclusions of her treating sources, to the extent that there was reliance upon Plaintiff's subjective complaints. (R. at 12 – 15, 17 – 19). As noted by the ALJ, Plaintiff's testimony and complaints contained discrepancies that justified calling her credibility into question. Her failure to consistently follow treatment

recommendations and medication regimens, her ability to drive in spite of her assertion to the contrary, her ability to manage her finances and benefits in spite of her assertion to the contrary, her ability to maintain attention and concentration in spite of her assertions to the contrary, and her reluctance to discuss her activities of daily living with Dr. Andrews – all weakened her credibility. (R. at 12 – 15, 17 – 19). Based upon this evidence, the ALJ's treatment of the longitudinal medical record was supported by substantial evidence. The findings of Plaintiff's treating sources do not lend any greater support for her arguments.

The opinion of a treating medical source "does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). *See also Brown*, 649 F. 3d at 196 (quoting *Kertesz v. Crescent Hills Coal Co.,* 788 F. 2d 158, 183 (3d Cir. 1986)) (An "ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw his own inferences."). Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer v. Apfel*, 186 F. 3d 422, 430 (3d Cir. 1999) (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

Notes from treatment at Chestnut Ridge, intake notes from Axiom, and consultative notes from Dr. Andrews indicated that Plaintiff did not suffer from major issues with concentration and attention. (R. at 12 – 15, 17 – 19). Despite Ms. Uffelman's finding to the contrary, the treatment record regularly notes that Plaintiff was well groomed and practiced good hygiene. (R. at 12 – 15, 17 – 19). In general, Ms. Uffelman's assessment differs from that of both Drs. Andrews and Schiller. (R. at 12 – 15, 17 – 19). Ms. Uffelman's treatment notes and functionality assessment were based largely upon the subjective complaints of Plaintiff – complaints which, as discussed, were less than credible. (R. at 12 – 15, 17 – 19). This

combination of factors provided ample reason for the ALJ to attribute less weight to Ms. Uffelman's findings.

With respect to Dr. Andrews' consultative examination, the ALJ disregarded his limitations findings only to the extent that the findings were without support in his examination notes. Despite opining in his examination notes that Plaintiff was fully oriented, was able to think, reason, and respond adequately, had grossly intact memory, had goal-oriented, relevant, and logical thought processes, performed all tasks and responded to all questions without any confusion, loss of concentration, or difficulty with attention span, persisted well with encouragement, was free of impairment or distortions of reality, lacked signs of psychomotor dysfunction, provided adequate responses to judgment questions, was generally cooperative throughout her session, could complete simple tasks, and maintained a good relationship with her daughter, Dr. Andrews found that Plaintiff had marked limitations in interacting with the public and supervisors, but not co-workers, and marked limitations responding to pressure and changes in typical work settings. (R. at 12 – 15, 17 – 19). He provided no justification for these limitations findings. Moreover, Dr. Schiller – having reviewed the same medical record and examination notes – concluded, as did the ALJ, that such marked findings were an overestimation of Plaintiff's functional limitations. (R. at 12 – 15, 17 – 19). To this end, the ALJ's decision was adequately supported. Not only did the record not support Dr. Andrews' more severe findings, but the ALJ was entitled to rely on Dr. Schiller's assessment. "State agent opinions merit significant consideration." *Chandler*, 667 F. 3d at 361 (citing SSR-96-6p) ("State agency medical and psychological consultants . . . are experts in the Social Security disability programs."). Substantial evidence supported the ALJ's treatment of the medical opinions on record.

## C. CONCLUSION

Based upon the foregoing, the ALJ provided a sufficient evidentiary basis to allow this Court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 7) be denied, Defendant's Motion for Summary Judgment (ECF No. 11) be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

*s/ Maureen P. Kelly*
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: May 3, 2013

cc/ecf: All counsel of record.